## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

| | | |
|---|---|---|
| **EVELYN WILLIAMS, Individually,** | * | |
| **and as Administrator of the** | * | |
| **ESTATE OF DESMOND** | * | **Civil Action File No.** |
| **WILLIAMS,** | * | **_____** |
| | * | |
| | * | |
| **Plaintiff.** | * | **JURY TRIAL DEMANDED** |
| | * | |
| | * | |
| **v.** | * | |
| | * | |
| **ST. JUDE MEDICAL, S.C., INC.,** | * | |
| **ST. JUDE MEDICAL, INC., &** | * | |
| **PACESETTER, INC., d/b/a ST.** | * | |
| **JUDE MEDICAL CARDIAC** | * | |
| **RHYTHM MANAGEMENT** | * | |
| **DIVISION,** | * | |
| | * | |
| **Defendants.** | * | |

## COMPLAINT FOR DAMAGES

COMES NOW, Evelyn Williams, individually and as Administrator of the

Estate of Desmond Williams ("Plaintiff" or "Ms. Williams") and files this

Complaint against the Defendants as follows:

## INTRODUCTION

1.  St. Jude Medical, Inc., St. Jude Medical S.C., Inc., and Pacesetter, Inc. d/b/a
    St. Jude Medical Cardiac Rhythm Management Division (collectively
    referred to as "St. Jude" or "Defendant") manufactures a variety of medical
    devices to treat heart conditions, including implantable cardiac
    defibrillators ("ICDs") and the wire that connects the ICD to the heart,
    known as a "lead."

2.  ICDs are used in patients who have arrhythmias or irregular heartbeats that
    are considered life-threatening. Individuals with these medical problems
    include patients who are at risk for ventricular fibrillation (rapid, ineffective
    contraction of the ventricles of the heart), and ventricular tachycardia
    (excessively rapid heartbeat) that are poorly controlled with medication.
    These arrhythmias or irregular heartbeats can result in the loss of
    consciousness or death, unless the patient receives therapy from an
    appropriate device to put the heart back into a more appropriate cardiac
    rhythm.

3.     ICDs are typically implanted primarily under the skin of the chest wall. The

device's power source, or pulse generator, is implanted in a pouch formed in

the chest wall generally over the left pectoral muscle.

4.     Leads act to conduct the electrical impulses between the heart and the ICD.

Low voltage pacing therapy to treat slow heart rhythms is provided through

pace-sense electrodes.  High voltage shocks for defibrillation are provided

through high voltage conductors. Typically, high voltage leads are inserted

through a major vessel and attached directly to the muscle on the inside of

the heart. Electrodes that sense the heart's rhythm are built into the lead

wires and positioned in the heart, where they monitor the heartbeat and can

transmit an electric shock from the ICD to abort dangerous heart rhythms

or pace the heart at a normal rhythm.

5.     If an implanted ICD and lead operate properly, the system can save a

patient's life. Any failure that compromises the ability of the lead to conduct

electrical signals will prevent the ICD from functioning correctly.  Lead

failures may result from, among other things, abrasion to the outer cover of

the lead that can prevent the ICD from administering a high voltage shock

to the patient's heart. If either the ICD or the lead fails to operate, the patient may die within minutes.

6.  Desmond Williams relied on an ICD and Durata lead manufactured by St. Jude to treat his serious heart condition - hypertrophic cardiomyopathy – non-obstructive type.

7.  On May 24, 2014, Mr. Williams' ICD failed to administer an appropriate shock to Mr. Williams' heart because friction between the external insulation on the Durata lead and the ICD exposed the wires inside the lead, causing the ICD to malfunction when it attempted to administer the shock.

8.  As a direct and proximate cause of the malfunction, Mr. Williams suffered a cardiac arrest and died a week later.[1]

9.  In this action for money damages, Ms. Williams asserts product liability claims under Georgia law, including claims of strict liability

---

[1] The parties entered into a Tolling Agreement tolling the applicable statute of limitations through and including November 30, 2016.

and negligent manufacturing, negligent failure to warn and negligent misrepresentation against the Defendants.

## **PARTIES**

10.   Plaintiff Evelyn Williams is a resident of the State of Georgia.

11.   Ms. Williams brings this action for the wrongful death of her son, Desmond Williams, as his next of kin and seeks damages for the value of the life of his pursuant to O.C.G.A. § 51-4-2 in excess of $75,000.00.

12.   Prior to his demise, Desmond Williams was also a resident of the State of Georgia; therefore, in her capacity as the Administrator of the Estate of Desmond Williams, Ms. Williams is deemed to be a resident of the State of Georgia.  28 U.S.C. § 1332(c)(2).

13.   As Administrator of the Estate of Desmond Williams, Ms. Williams brings this action on behalf of the Estate and seeks damages for his conscious pain and suffering and his funeral, medical and other necessary expenses in excess of $75,000.00.

14.   Defendant St. Jude Medical, Inc., is a Minnesota corporation that is

headquartered in St. Paul, Minnesota at One St. Jude Medical Drive, St.

Paul, Minnesota 55117.  St. Jude Medical, Inc. is registered with the Georgia

Secretary of State as a foreign for profit corporation authorized to conduct

business within the State of Georgia.  St. Jude may be served with summons

and a copy of the complaint upon its registered agent, CT Corporation

System, 1201 Peachtree St. NE, Atlanta, GA 30361.

15.     Defendant St. Jude Medical, S.C., Inc., is a Minnesota corporation that is

headquartered in St. Paul, Minnesota at One St. Jude Medical Drive, St.

Paul, Minnesota 55117.  St. Jude Medical, S.C., Inc. is registered with the

Georgia Secretary of State as a foreign for profit corporation authorized to

conduct business within the State of Georgia.  St. Jude may be served with

summons and a copy of the complaint upon its registered agent, CT

Corporation System, 1201 Peachtree St. NE, Atlanta, GA 30361.

16.      Defendant Pacesetter, Inc. ("Pacesetter") is a Delaware corporation

operating as a wholly owned subsidiary of St. Jude Medical, Inc.

Pacesetter's principal place of business is located at St. Jude's

manufacturing facility at 15900 Valley View Court, In Sylmar, California.

Pacesetter, doing business as St. Jude Medical Cardiac Rhythm Management

Division, develops, manufactures and distributes cardiovascular and implantable neurostimulation medical devices, including the Durata leads at issue here.

## JURISDICTION AND VENUE

17.   This Court has original jurisdiction over this action for money damages in excess of $75,000.00 involving citizens of different states.  28 U.S.C. § 1332.

18.   This Court has personal jurisdiction over the Defendants because they placed Durata leads into the stream of interstate and worldwide commerce and transacted, solicited and conducted business in the State of Georgia, including in the geographic area comprising the jurisdiction of the Atlanta Division of the Northern District of Georgia.

19.   Venue is proper in this Court as a substantial part of the events or omissions giving rise to the claim occurred in the geographic area comprising the jurisdiction of the Atlanta Division of the Northern District of Georgia. 28 U.S.C. § 1391(b)(2).

# FACTUAL ALLEGATIONS

### A.   EVENTS LEADING TO THE DEATH OF DESMOND T. WILLIAMS

9.    At the time of his death, Desmond T. Williams ("Mr. Williams") was a 33-year-old man at high risk for cardiac arrest.

10.   Mr. Williams experienced an aborted sudden cardiac death on July 15, 2010.

11.   He was hospitalized and diagnosed with hypertrophic cardiomyopathy, non-obstructive type.

12.   On July 19, 2010, Dr. Stamatios Lerakis operated on Mr. Williams and implanted two devices designed, manufactured and sold by St. Jude:  a Fortify VR defibulator device and a Durata 7120Q STS Optim Active Fixation Lead (58 cm).

13.   Dr. Lerakis attached the Durata lead to the right atrium and imbedded the tip of the lead in the right ventricle of Mr. Williams' heart.

14.   Doctors monitor ICD devices to ensure that they are functioning correctly using a non-invasive process known as "interrogation."  During an interrogation, the device is connected to a device programmer using a

special wand placed on the skin over the ICD.  The data is transmitted from the device to the programmer and evaluated.

15.    Before Mr. Williams left the care of Dr. Lerakis, his ICD was interrogated on August 2nd and August 24, 2010 and found to be in good working order.

16.    Dr. Lerakis referred Mr. Williams to Dr. Bryan Williams at the Emory Clinic's Heart and Cardiovascular Center.

17.    Mr. Williams' first appointment with Dr. Williams was on February 22, 2011.  Dr. Williams interrogated the ICD.  The interrogation revealed that the ICD was in good working order and that Mr. Williams had not experienced any ventricular tachycardia events or ICD shocks.

18.    On or about March 22, 2012, Mr. Williams lost consciousness and fell to the ground at work in Lake City, Florida.

19.    Interrogation of his ICD device revealed that the ICD had properly detected rapid VT or VF and sent a single shock to Mr. Williams' heart to convert his heart rhythm.

20.    On or about January 31, 2014, Mr. Williams fainted and fell to the ground striking his head on the floor.

21.   Mr. Williams was admitted at Grady Hospital. Interrogation revealed that the ICD properly detected a ventricular fibrillation and sent a single shock that converted Mr. Williams' heart rhythm.

22.   The interrogation also revealed that Mr. Williams had experienced an episode of ventricular tachycardia that was successfully treated with an ICD shock on December 28, 2013.

23.   Mr. Williams followed up with Dr. Williams on February 4, 2014.  Dr. Williams spoke with one of Mr. Williams' treating physicians at Grady and confirmed that Mr. Williams' EKG was essentially unchanged from his prior EKGs and that the ICD report showed that the device appeared to be functioning correctly.

24.   On May 22, 2014, Mr. Williams suffered a cardiac arrest and collapsed on a MARTA platform. He was unresponsive for an unknown period prior to the arrival of EMT personnel.

25.   Mr. Williams was admitted to Grady Hospital. Interrogation of the ICD revealed that Mr. Williams experienced a VT/VF event with a shock that did not convert rhythm at 5:18 p.m.  Simultaneously with the shock, lead impendence dropped to a value that would not support further defibrillation;

as a result, the ICD device attempted 11 antitachycardia pacing stimulation

therapies and 4 shocks to terminate the tachyarrhythmia all to no avail.

26.    Mr. Williams never regained consciousness and died on May 31, 2014.

27.    Following protocols set forth in the Federal regulations governing medical

devices, Dr. David Hirsh, one of Dr. Williams' partners, took steps to

ensure that the ICD and Durata lead were returned to St. Jude for inspection

and testing.

28.    Upon information and belief, Victor Tran, a St. Jude employee, was

responsible for conducting the inspection of Mr. Williams' ICD and Durata

lead.

29.    Mr. Tran's visual inspection of the ICD revealed an arc mark on the lower

left front corner of the ICD can and detected the presence of lead conductor

material at the site of the arc mark.  A test shock revealed no output due to

Shorted Output Stage Detection.  Mr. Tran cut open the ICD and found that

the output transistors were damaged.

30.    Mr. Tran also inspected the Durata lead. Visual inspection noted an external

insulation abrasion at 11.2 cm to 11.6 cm from the connector pin, consistent

with lead friction to the ICD can. The ETEFE coating of one of the two RV

conductor cables was abraded at this location.  The other RV conductor cable was melted and broken.

31.  Mr. Tran concluded that during the high voltage therapy delivery, the lead arced to the ICD can, damaging the device's high voltage output circuitry. Analysis of the Durata lead indicated that the reported low HV lead impendence was attributed to external insulation abrasion exposing the RV conductor cables.

32.  The analysis revealed that the external abrasion was caused by lead-to-can interaction in the prepectoral pocket ultimately exposing the HV RV conductor.  This type of failure is commonly referred to as a "can abrasion."

33.  Dr. Anand D. Shaw, Dr. David Hirsh and Jonathan J. Langberg, three physicians from the Division of Cardiology at the Emory School of Medicine ("Emory Doctors") published a Case Report analyzing the cause of Mr. Williams' death, namely, the failure of the Durata lead implanted in his heart.

34.  The Emory Doctors first noted that St. Jude introduced the Durata family of leads to replace the preceding Riata line following increased rates of

internal abrasion and lead failure.  St. Jude addressed design flaws in the

Riata line by adding a layer of additional proprietary silicone-polyurethane

copolymer trademarked as Optim on the outer surface of the lead,

increasing the diameter of the lead, and shifting the positions of the

surrounding ethylene tetrafluoroethylene (ETFE) insulated high-voltage

(HV) and pace sense conductor cables closer to the inner lumen of the lead.

35.   Unlike the internal abrasion and lead failures observed among the Riata

line, Mr. Williams' case involved a catastrophic *external* insulation breach.

36.   The Emory Doctors found that the nature of the failure may not be

associated with electrical abnormalities until a high-energy shock is

delivered and, as a result, traditional methods of detecting malfunctions,

including regular interrogation, would not detect this failure.  Instead, the

failure would only manifest when the defibrillator senses an irregular heart

rhythm and attempts to send a shock to the patient's heart to save his life.

37.   Upon information and belief, the lead-to-can abrasion failure that caused

Mr. Williams' ICD malfunction and ultimately caused his death occurred

because of known manufacturing defects affecting the long-term

functioning of Durata leads.

B.     **THE FEDERAL FOOD, DRUG & COSMETIC ACT AND THE FDA'S REGULATORY PROCESS RELATED TO THE DESIGN, PRODUCTION, MANUFACTURE AND SALE OF MEDICAL DEVICES.**

38.     The Food Drug & Cosmetic Act ("FDCA"), 21 U.S.C. 301 et seq., addresses the development, manufacturing, and distribution of medical devices in the United States. The Food and Drug Administration ("FDA") is responsible for ensuring that medical device manufacturers abide by the FDCA and applicable regulations.

39.     A pre-market approval application ("PMA") must be submitted to the FDA for any Class III medical device. *See* 21 U.S.C. 515(b) & §814.3(e). A PMA must contain certain information which is critical to the FDA's evaluation of the safety and efficacy of the medical device at issue. A PMA and/or PMA Supplement application must provide: (a) proposed indications for use; (b) device description including the manufacturing process; (c) any marketing history; (d) summary of studies (including non-clinical laboratory studies clinical investigations involving human subjects, and

conclusions from the study that address benefit and risk considerations); (e)

methods used in manufacturing the device, including compliance with

Current Good Manufacturing Practice ("CGMP") requirements set forth in

the Code of Federal Regulations (See 21 CFR § 820 et seq.); and (f)

information relevant to an evaluation of the safety and effectiveness of the

device known to or that should reasonably be known to the manufacturer

from any source, including commercial marketing experience.

40.    The FDCA makes it illegal to sell "adulterated" medical devices. A device is

adulterated under the FDCA if the methods used in its manufacture do not

conform to CGMP.

41.    Exercising its authority under a related statute, The Safe Medical Devices

Act ("MDA"), the FDA has also created the quality system ("QS")

regulation. Under the QS regulation, manufacturers must establish various

specifications and controls for devices; that devices be designed and

manufactured under a quality system to meet such specifications; that

devices be correctly installed, checked and serviced; that quality data be

analyzed to identify and correct quality problems; and that complaints be

processed. The QS regulation is thus intended to help assure that medical

devices are safe and effective for their intended use.

42.    The FDA conducts inspections of FDA-regulated facilities to determine a

firm's compliance with the FDCA and the QS regulation applicable to

manufacturers of medical devices.

43.    FDA Form 483 is issued to firm management after an inspection when FDA

investigators have observed conditions that they believe may constitute

violations of the FDCA and related statutes and regulations. Observations

listed on a Form 483 notify management of objectionable conditions and

are typically noted when conditions or practices are observed indicating that

a device (or other FDA-regulated product) has been adulterated or is being

prepared, packed, or held under conditions whereby it may become

adulterated or rendered injurious to health.

44.    Failure to adequately respond to or correct issues raised in a Form 483 may

result in the FDA's issuance of a Warning Letter. Warning Letters are

intended for violations of the statute or regulations that are deemed to be of

"regulatory significance." A matter is of regulatory significance where the

violation is such that it may lead to an enforcement action if not promptly

and adequately corrected.

45.    The FDA can recall medical devices that pose health risks.  The recalls are

        categorized by classes.  Class I recalls are the most severe.  The FDA will

        issue a Class I recall when there is a potential of serious injury or death if

        the product or device is used.

C.    THE REGULATORY APPROVAL PROCESS SPECIFIC TO THE RIATA AND
       DURATA LEADS

46.    On March 11, 2002, the FDA approved the Riata Series 1500 Defibrillation

        Lead System for Riata Model Numbers 1570, 1571, 1580, and 1581. (St.

        Jude's application number P950022/S014.)

47.    Over the next several years, the FDA approved a series of supplemental

        PMAs submitted by St. Jude for design, manufacturing, supply chain

        changes, as well as the introduction of new Riata models, including the

        Riata ST.

48.    The FDA relied on the representations and commitments made by St. Jude in

        the PMA and PMA supplements, particularly related to St. Jude's testing,

validation, manufacturing and monitoring methods and protocols, when it approved the PMA and PMA supplements.

49.  In 2006 and 2007 respectively, the FDA approved St. Jude's supplemental PMA to manufacture Riata ST Optim and Durata single and dual coil ICD leads.

50.  In 2009, the FDA approved a supplemental PMA for a Durata lead with a new in-line connector pin.  Traditional lead devices are attached to ICDs with three connectors; the new Durata lead with an in-line connector pin, attached with a single connector.

51.  Upon information and belief, a Durata lead with an in-line connector pin was implanted in Mr. Williams.

52.   21,000 Riata ST Optim and 114,000 Durata leads had been sold in the USA by July 2011, including the Durata lead that was implanted in Mr. Williams.

53.  The primary design change between the Riata family of leads and Durata leads was the addition of an outer Optim sheath.

54. When manufactured in conformance with the design approved by the FDA, St. Jude represented that the outer Optim sheath increased the lead body insulation thickness by 50% relative to Riata and Riata ST leads.

55. When manufactured in conformance with the design approved by the FDA, St Jude represented that the outer Optim sheath was 50X strong than the Silicone sheaths used in Riata and Riata ST leads.

56. When manufactured in conformance with the design approved by the FDA, St. Jude represented that full Optim insulation covered IS-1 and DF-1 connector tails on Durata leads to protect against abrasion, as well as other potential failures.

57. Upon information and belief, St. Jude introduced the Riata ST Optim and Durata leads at least in part because of an apparent design defect in the Riata and Riata ST leads that was causing internal insulation breaches. St. Jude stopped marketing and selling the Riata and Riata ST leads by December 2010.

58.    In November 2011, St. Jude updated physicians on the abrasion failures

associated with the Riata and Riata ST leads, informing them that the

failure rate was higher than previously reported by the Company.

59.    The Food and Drug Administration (FDA) deemed this communication as a

"Class 1" recall because there was a reasonable probability that use of

Riata leads could cause serious adverse health consequences or death.

60.    The FDA also ordered St. Jude to conduct post marketing surveillance on

all Riata and Durata leads.


D.    **PHYSICIANS UNCOVER EVIDENCE OF POSSIBLE MANUFACTURING
DEFECT LEADING TO CAN ABRASIONS PRIOR TO THE DEATH OF
DESMOND WILLIAMS.**


61.    When St. Jude first introduced the Durata family of leads in 2007, St. Jude

represented that they were far less susceptible to insulation abrasions in part

because they were coated using Optim.

62.    But on or about July 6, 2012, the Minneapolis Heart Institute Foundation

published an article in the European Society of Cardiology Journal (among

other publications) finding that Durata ICD leads remained susceptible to insulation abrasions.

63.   The authors used information contained in the MAUDE database (MAUDE) maintained by the FDA.  The FDA requires that US manufactures report adverse events that are communicated to them verbally or in writing.  Manufactures must also report the results of any investigation into the causes of device malfunctions.

64.   The authors searched MAUDA using basic search terms including "Durata abrasion analysis."

65.   Between December of 2007 and January of 2012, St. Jude reported 37 incidents for "Durata abrasion analysis" in MAUDE.

66.   The reported incidents included 12 out of 37 (32%) "can abrasions." Riata ST Optim revealed 8 of 15 (53%) incidents of "can abrasions."

67.   Upon information and belief, "can abrasions" may occur when the lead is in contact with the pulse generator in the pocket of the ICD, i.e. the location where the lead connects to the ICD.

68.  All the failures reported in the MAUDE database occurred in leads that had been implanted for 4 years or less.  Mr. Williams' ICD and lead had been implanted for 45 months at the time of his death.

69.  A more recent study conducted by the same Emory Doctors who published a Case Study of Mr. Williams' death revealed that the abrasion rate for Durata lead was significantly greater than for leads produced by other manufacturers. (See infra, ¶ 33.)

70.  The Emory Doctors limited their study to the period from January 1, 2014 to January 1, 2015 and used the MAUDE database to identify reported cases of lead failures.

71.  The MAUDE database returned 82 usable reports of abrasion of a Durata lead.

72.  The Emory Doctors also reviewed the annual product performance reports ("PPR").  PPRs do not provide case-level information such as patient characteristics, abrasion location, or the electrical/clinical consequences of the malfunction; they only provide a general description of the mechanism of failure, estimates of total active implants and lead failure rates.

73.     The PPR reports revealed 93 Durata abrasion failures. The abrasion failure
        rate was significantly higher in the older model Durata leads such as the
        one implanted in Mr. Williams.

74.     Four patients with Durata leads presented with failure of high-voltage
        therapy or death, 3 occurring without a history of electrical malfunction.
        This did not occur with leads manufactured by other companies.

75.     21 Patients with Durata abrasion had a full-thickness defect with disruption
        of the ETFE coating and exposure of the conductors.

76.     Of the reported Durata insulation failures, 69.5% were identified to be the
        result of interaction between the lead and the ICD generator similar to the
        abrasion that caused the failure of Mr. Williams' ICD.

77.     Durata lead abrasion was more likely to manifest as a visible abrasion from
        interaction between the lead in the pocket and the adjacent ICD generator,
        similar to the location where the abrasion that caused the failure of Mr.
        Williams' ICD occurred.

78.     Comparison of the two studies suggests that the frequency of abrasion may
        increase as the Durata leads age.

79.    The Emory Doctors considered the chemical composition of the Optim

coating as a possible explanation for the progressive risk of Durata abrasion

seen in their study.

> The Optim coating used in the outer covering of the Durata lead is a proprietary polydimethylsiloxane urethane.  This is similar to polyurethane, but with substation of siloxane for the ether moety. This is intended to maintain the strength and structural integrity of the polyurethane, while avoiding the progressive stiffness and cracking that can occur with metal ion oxidation. Optim, however, does demonstrate time- and temperature-dependent and hydrolytic damage.  This causes a progressive reduction in molar mass due to shortening of polymer chain length in vivo.  With less molecular length available for cross linking and entanglement, from which material strength is derived, there is a reduction in abrasion resistance. This may be an explanation for what appears to be a low, but progressive risk of Durata abrasion seen in the current study.

80.    Although St. Jude has never disclosed any information that would put

medical professionals on notice of the risk of lead-to-can abrasion, the

company's latest generation of ICD and cardia resynchronization therapy

defibrillator generators have been modified with a parylene coating along

the edges to provide improved abrasion resistance.

E. **THE FDA INSPECTS ST. JUDE'S MANUFACTURING FACILITY AND ISSUES WARNING LETTER IDENTIFYING DEFICIENCIES IN TESTING, VALIDATION AND MANUFACTURING PROTOCOLS FOR DURATA LEADS**

81. St. Jude applied and received approval for original manufacturing processes, verification procedures, specific protocols, recordkeeping procedures, reporting procedures to the FDA, use of calibrated and specialized manufacturing equipment, training procedures for personnel, and testing procedures for manufactured samples.

82. To gain approval of the PMA and supplemental PMAs, St. Jude represented to the FDA that it would comply with existing Federal regulations by, among other things, verifying that testing and manufacturing protocols were being followed through subsequent inspection and testing, establishing and maintaining a design history file for each type of device, establishing and maintaining procedures for implementing corrective and preventive action.

83. St. Jude failed to adhere to the commitments made to the FDA in the PMA and supplemental PMA set forth in Paragraphs 81-82 in the ways set forth in the FDA's Warning letter, as well as other ways, resulting in the

Page 25 of 48

production of defective Durata leads like the lead implanted in Mr. Williams. (See *infra* ¶¶ 85-88.)

84. As a direct and proximate cause of St. Jude's failure to adhere to its commitments to test, validate and manufacture Durata leads in conformance with its own PMA as well as CGMPs of the FDA's QS regulation, St. Jude manufactured defective Durata leads susceptible to lead-to-can abrasions like the one that caused Mr. Williams' death.

85. Between September 25, 2012, and October 25, 2012, the FDA conducted an inspection of the St. Jude production facility located in Sylmar, California. This inspection resulted in the issuance of a Form 483, which enumerated multiple violations of the FDCA.

86. The FDA released the Form 483 to the public on or about November 20, 2012. Although it is redacted, the Form 483 shows that the observations of objectionable conditions pertained to the Durata lead.

87. The FDA report found significant flaws in the Company's testing and oversight of the Company's heart device equipment that were of significance considering clinical findings calling into question Optim's

durability over time. (See *infra*, ¶¶ 61-84.) FDA inspectors found that the company failed to follow its own written protocols for testing the product, and did not properly evaluate some study results. The agency also concluded that St. Jude did not adequately follow up on problems it identified in the manufacturing process, and did not properly investigate some complaints the company received about incidents of failure involving Durata leads.

88.     Following on the heels of the October 17th inspection, the FDA issued a warning letter to St. Jude on January 10, 2013.  In pertinent part, the warning letter stated:

> This inspection revealed that these devices are adulterated within the meaning of section 501(h) of the Act, 21 U.S.C. *§* 351(h), in that the methods used in, or the facilities or controls used for, their manufacture, packing, storage, or installation are not in conformity with the current good manufacturing practice requirements of the Quality System regulation found at Title 21, Code of Federal Regulations (CFR), Part 820.

> These violations include, but are not limited to, the following:

> 1. Failure to ensure, when the results of a process cannot be fully verified by subsequent inspection and test, that the process shall be validated with a high degree of assurance and approved according to established procedure, as required by 21 CFR 820.75(a). For example, your firm created multiple

different holders to hold leads during (b)(4). Your firm did not specify how these holders were installed or qualified to ensure they met their intended use.

2. Failure to establish procedures for monitoring and control of process parameters for validated processes to ensure that the specified requirements continue to be met, as required by 21 CFR 820.75(b). For example, your firm does not monitor the flow of the **(b)(4)** to the **(b)(4)** machines to ensure the appropriate amount of **(b)(4)** is supplied, as specified in section 3.4.1.9 of the **(b)(4)** manual, **(b)(4).** The manual specifies a **"(b)(4)."**

3. Failure to establish and maintain adequate procedures for verifying the device design. Design verification shall confirm that the design output meets the design input requirements, as required by 21 CFR 820.30(b). For example:

   a. Your firm failed to validate the **(b)(4)** test methods implemented during the Durata design verification testing. These test methods were created in-house to verify your firm's design inputs; however, they were not based on and did not follow a national standard.

   b. Your firm failed to follow its test procedure, **(b)(4)** *Rev. D, released   05109/2003,* during design verification testing of the **(b)(4).** Specifically, the procedure required each lead to be tested 5 times and the mean of the 5 tests would be considered the result. However, your firm only tested each lead one time to determine the results.

   c. Your firm performed design verification of the Durata lead prior to establishing design inputs. Specifically, your firm performed the design verification study to ensure the **(b)(4)** was not excessive on June 7, 2007, prior

to establishing the design input that "the (b)(4) of the (b)(4) shall be (b)(4)" on July 16, 2007.

4.  Failure to establish and maintain a design history file for each type of device, as required by 21 CFR 820.30G). For example, your firm was unable to demonstrate when key elements of a design history file for the Durata design project were conducted   and approved, such as design inputs, outputs, verification, validation, and design transfer.

5.  Failure to establish and maintain procedures for implementing corrective and preventive action, as   required by 21CFR 820.100(a). For example:

    a.   Your firm's procedure, *Corrective and Preventive Action Procedure, SOP 3.3.5 Rev. Y, dated May 30, 2012, states* that a CAPA (PIR: Product Improvement request) closure memo shall include a statement of effectiveness of the CAPA. However, your firm's CAPAs designated as PIR 12-004 and PIR  11-013 were closed on August 16, 2012, and September 14, 2012, respectively, without a statement or reference to a verification of effectiveness.

    b.   Your firm's procedure, *Corrective and Preventive Action Procedure, SOP 3.3.5 Rev. Y, dated May 30, 2012, states* that an effectiveness check shall be performed on any PIR that has been closed, unless there is a justification that no effectiveness check is required. However, your firm's CAPAs designated as PIR 12-008 and PIR 12-007 were closed on September 10,2012, and September 11, 2012, respectively, and state that "no effectiveness check is required" without any documented justification.

    c.  Your firm's CAPA procedures do not require a determination as to whether the action taken adversely affects the finished device.

Our inspection also revealed that your Durata lead is misbranded under section 502(t)(2) of the Act, 21 USC § 352(t)(2), in that your firm failed or refused to furnish material or information respecting the device that is required by or under section 519 of the Act, 21 USC § 360i, and 21CFR Part 803 – Medical Device  Reporting (MDR). Significant deviations include, but are not limited to: Failure to report to the FDA no later than 30 calendar days after the day that your firm received or otherwise became aware of information, from any source, that reasonably suggests that a device that your firm markets malfunctioned and that this device or a similar device that your firm markets would be likely to cause or contribute to a death or serious injury, if the malfunction were to recur, as required by 21 CFR 803.50(a)(2).

For example, complaint numbers AHH029263, BKB10735, AHH24652, and ADH32782 refer to malfunctions of your firm's Durata lead. The Durata lead is a life-supporting or life-sustaining medical device and a malfunction involving such a device is reportable. <u>See</u> Medical Devices; Medical User Facility and Manufacturer Reporting, Certification and Registration (preamble); Final Rule, 60 Fed. Reg. 63585, comment 12 (Dec. 11, 1995). There is no information in your firm's complaint file that justifies why the malfunctions referenced above would not be likely to cause or contribute to a reportable death or serious injury were they to recur.  An MDR should have been submitted for each of the referenced complaints.

**F.   MANUFACTURING DEFECTS AFFECTING DURATA LEADS**

89.   Upon information and belief, St. Jude's PMA and supplementary

applications and FDA regulations require that insulation diameters of the

outer sheath, as well as the sheaths surrounding individual electrical

conductors, be consistent along the length of the Durata lead.

90.   Upon information and belief, one of the manufacturing defects includes

inconsistent insulation diameter of the outer Optim sheath as well as the

insulation surrounding the individual electric conductors. Failure to

manufacture uniform insulation diameters leads to abrasion at thinner

insulation sites, leading to device failure.

91.   The inconsistency in the application, preparation, and manufacturing

process of the outer Optim sheath, as well as the coating of the lead wires

or cables, results in roughness, absence of coating, bubbles, valleys,

inconsistent cross-section diameters and foreign materials, among other

things, creating a surface of the coating which is abrasive, cutting, and when

coiled behind the ICD generator, leads to abrasions and breach of the

coating of the wire.

92.   In addition, such inconsistency in the application, preparation and
      manufacture of the coating of the lead wires or cables results in increased
      stiffness, brittleness, lack of flexibility, and relative movement between the
      wire or cables and the lead tube insulation resulting in weakness and
      potential breach of the outer Optim Coating, as well as abrasive cutting,
      penetration, and breach of the lead tube insulation.

93.   The inconsistency in the manufacture, chemical composition, and
      preparation of the insulating lead tube, in addition to inconsistent insulation
      diameters, has created rough and inconsistent interior diameter surfaces,
      thin and thick wall areas of uneven distribution of chemical composition
      resulting in susceptibility to abrasive failure, brittleness, lack of flexibility,
      cracking, failure of insulation properties, and abrasive failure interaction
      due to relative movement of the tube insulation with the interior wires and
      leads resulting in abrasive cutting, penetration, and breach of the lead
      tube insulation.

94.   The breach of the outer Optim coating exposes the lead wires and can cause
      the leads to short, and to transmit incorrect information or noise to the

pacemaker/defibrillator thereby causing it to produce unnecessary and very painful shocks of electricity, or alternatively, to fail to communicate with the pacemaker/defibrillator at which point the life-saving therapies of the device are unavailable.

95.  Additionally, St. Jude applied and received approval for multiple changes to the cure and sterilization processes used in the manufacture of the Riata and Durata leads. Upon information and belief, St. Jude, failed to comply with the approved methods of curing and sterilization during the manufacture of the leads. Upon information and belief, failure to follow the approved cure and sterilization processes resulted in reduced tensile strength of the outer Optim coating as well as the silicone insulation surrounding the wires inside the outer coating of the Durata lead.

96.  St. Jude applied and received approval for numerous modifications to the welding and crimping procedures in the manufacture of the Riata and Durata leads. Upon information and belief, the PMA and Conditions of Approval required the application of a controlled, uniform degree of force when applying the crimp. Upon information and belief, failure to crimp

with a controlled, uniform, degree of force, resulted in insecure crimps, lead wire length differences both longer and/or shorter than specification for the length of the lead.

97.    The failure to assemble, crimp, manufacture and produce, as herein before alleged, has resulted in increased  tension and/ or compression  of the lead wires and lead tube insulator causing abrasion and friction between the lead wires and lead tube insulator, lack of flexibility of the assembly, resistance to flex resulting in relative movement between the lead wire and the lead tube insulator, failure of the lead wire and lead tube insulator and thus resulting in exposure of the lead wire outside of the lead tube insulator during use of the product in human beings.

98.    Upon information and belief, St. Jude committed to the FDA that the Riata and Durata leads would be manufactured in such a way as to have a useful life years longer than the leads actually have. St. Jude's failure to manufacture the leads such that they meet the useful life is a manufacturing defect that would not have occurred had the leads been manufactured as St. Jude committed to the FDA.

## CLAIMS FOR RELIEF

### COUNT I

### STRICT LIABILITY- MANUFACTURING DEFECT

99.   Upon information and belief, the Riata and Durata leads possess a

manufacturing defect because the actual manufacture of the leads differs

from the specifications set forth in the PMA and the conditions for approval

as herein before alleged and thereby violate the MDA and Federal

regulations and give rise to a parallel claim for Strict Liability –

Manufacturing Defect under Georgia law.

100.   This parallel claim does not impose any manufacturing requirements greater

than those imposed by the MDA and Federal regulations; rather, this claim

seeks to enforce St Jude's violations of federal standards.

101.   St. Jude is liable because the Durata lead was not merchantable and

reasonably suited to the use intended and was defective at the time it left St.

Jude's possession in the manners set forth more fully herein, including but

not limited to the manufacture of the outer Optim insulation covering in

such a manner that it was susceptible to lead-to-can abrasions resulting in externalization of wires within the Durata lead.

102.  As fully set forth herein, Defendants violated CGMP requirements in the production of the Plaintiff's Durata lead and Plaintiff's implantable defibrillator.

103.  As fully set forth herein, Defendants violated the FDCA by making unsanctioned adulterations to the Durata lead because the methods used in, or the facilities or controls used for, the Durata lead's manufacture, packing, storage, or installation were not in conformity with the CGMPs of the QS regulation.

104.  Defendant's unsanctioned adulteration of the Durata lead caused it to be unreasonably dangerous and unfit for its intended purpose.

105.  Defendants violated 21 CFR 820.75(a) by failing to ensure that the process of manufacturing the Durata lead was validated to a high degree of assurance and approved per established procedures.

106. Defendants violated federal law by creating multiple different holders to hold leads, but not specifying how those holders were installed or qualified, creating the likelihood that the holders would not met their intended use.

107. Defendants violated federal law by failing perform any testing to demonstrate the adequacy of the Durata leads that it manufactured.

108. Defendants violated 21 CFR 820.75(b) by failing to establish manufacturing procedures for monitoring of the Durata lead.

109. Defendants violated 21 CFR 820.75(b) by failing to establish procedures for control of process parameters and/or by failing to establish procedures for validating the processes of the production of the Durata lead to ensure that specified FDA requirements continue to be met.

110. Defendants violated 21 CFR 820.75(b) by failing to monitor the flow of the machinery that produced the Durata lead to ensure appropriate distribution.

111. Defendants violated 21 CFR 820.30(f) by failing to establish and maintain adequate procedures for verifying the design of the Durata lead.

112. Defendants violated 21 CFR 820.30(f) by failing to validate the test methods implemented during Durata lead design verification testing.

113. Defendants violated 21 CFR 820.30(f) by implementing, during the Durata design verification testing, test methods that did not follow a national standard, but instead created below grade in-house standards to verify design inputs.

114. Defendants violated 21 CFR 820.30(f) by failing to follow established test procedures, during design verification testing, including the fact that Durata leads were required to be tested five times during production but were typically only tested one time.

115. Defendants violated 21 CFR 820.30(f) by performing design verification of the Durata lead prior to it establishing design inputs.

116. Defendants violated 21 CFR 820.300) by failing to establish and maintain a design history file for the Durata design project, such as design inputs, outputs, verification, validation, and design transfer.

117. Defendants violated 21 CFR 820.100(a) by failing to establish and maintain procedures for implementing corrective and preventive action pertaining to the Durata lead.

118. Defendants violated 21 CFR 820.100(a) by creating Corrective and Preventive Action Procedures that did not require a determination as to

whether the action taken adversely affected the finished product and/or Durata lead.

119. Defendants violated 502(t)(2) of the Federal Food, Drug, and Cosmetic Act, 21 USC 352 (t)(2), by misbranding the Durata lead and/or in refusing or failing to furnish material or information respecting the device that is required by section 519 of the Act, 21 USC 360k and 21 CFR Part 803-Medical Device Reporting.

120. Defendants violated 502(t)(2) of the FFDCA, by failing to report to the FDA no later than 30 calendar days after receipt of information that the Durata malfunctioned, as required by 21 CFR 803.50(a)(2).

121. Defendants violated federal law by failing to comply with the Durata lead's FDA premarket approval requirements.

122. Defendants manufactured the Durata lead in violation of the terms, conditions, standards and specifications of the FDA Investigational Device Exemption Approval.

123. The Durata lead and/or defibrillator implanted in Plaintiff had an impurity, imperfection and/or other product defect that was a deviation from the quality manufacturing standards for the Durata lead, leaving the device in a

defective condition and unreasonably dangerous to Plaintiff when it left Defendants' control.

124.  Defendants violated federal law by failing to take proper action in petitioning the FDA for a label change to more accurately reflect the risks associated with the Durata lead, including premature deterioration.

125.  As a direct and proximate result of the manufacturing defect, Mr. Williams suffered catastrophic injuries and death giving rise to claims for damages to his Estate and his heirs as more fully set forth herein.

## COUNT II

## NEGLIGENCE – MANUFACTURING DEFECT

126.  Plaintiff hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

127.  Defendants have a duty to exercise reasonable care in manufacturing the Durata leads to make them reasonably safe for their intended and foreseeable uses by, among other things, strictly adhering to the testing, validation, manufacturing and monitoring protocols contained in the PMA and

conditions of approval, as well as applicable Federal regulations controlling the manufacture of medical devices. (See *infra* ¶¶ 104-124.)

128.  As fully set forth herein, Defendants failed to exercise the degree of care, precaution and vigilance as the circumstance demanded by manufacturing the Riata and Durata leads by, among other things, strictly adhering to the testing, validation, manufacturing and monitoring protocols contained in the PMA and conditions of approval, as well as applicable Federal regulations controlling the manufacture of medical devices.

129.  Defendants knew or should have known that failing to strictly adhere to the testing, validation, manufacturing and monitoring protocols contained in the PMA and conditions of approval, as well as applicable Federal regulations controlling the manufacture of medical devices, was likely to result in the production of Durata leads with a latent defect that, in turn, would present a reasonably foreseeable risk of severe injury or death to users like Mr. Williams.

130.  Upon information and belief, the Durata lead in question was defective in that, among other things, it was made of improper and defective material; it was improperly designed; it was improperly manufactured; it failed to

have  adequate  and  proper warnings or instructions;  it was not safe to be

used for the purposes intended; it was inherently and/or  unreasonably

dangerous;  its utilization violated  FDA regulations;  and it caused  severe

injuries while being used and the products were otherwise defective.

131.   As a direct and proximate result of the manufacturing defect, Mr. Williams

suffered catastrophic injuries and death giving rise to claims for damages to

his Estate and his heirs as more fully set forth herein.


## COUNT III

## NEGLIGENT MISREPRESENTATION

132.   Plaintiff hereby incorporates by reference all preceding paragraphs as if

fully set forth herein.

133.   As more fully set forth herein, Defendants represented to the FDA,

physicians and patients that Durata leads coated with Optim were

significantly stronger than lead products that were not coated with

Optim and were therefore more suitable for long term use.

134.   At the time these representations were made, Defendants knew or should have known that the suitability of Durata leads for long-term use was uncertain and thus presented a reasonably foreseeable risk of severe injury or death to users like Mr. Williams.

135.   Mr. Williams reasonably relied on the representations made by the Defendants when he elected to have an ICD and Durata lead implanted in his chest and heart.

136.   As a direct and proximate result of the Defendants' negligent misrepresentations, Mr. Williams suffered catastrophic injuries and death giving rise to claims for damages to his Estate and his heirs as more fully set forth herein.

## COUNT IV

## NEGLIGENT FAILURE TO WARN

137.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

138.   Federal Regulations impose standards of care on the Defendants related to the manufacture, marketing, and sale of the Riata and Durata leads.

139.  Plaintiffs allege the Federal Regulations define the standard of care, and

thus, the Defendants duties are contained in, but not limited to, the

following: 21 CFR 803.10; 21 CFR 803.50; 21 CFR 803.52; 21 CFR

803.53; 21 CFR 803.56; 21 CFR 806; 21 CFR 814.80; 21 CFR 814.82; 21

CFR 814.84; 21 CFR 820.5; 21 CFR 820.20; 21 CFR 820.22; 21 CFR

820.25; 2121 CFR820.70.

140.  Upon information and belief, the Conditions of Approval for the Durata

leads incorporate these statutes and regulations. Failure to comply with the

Conditions of Approval invalidates the approval order. *See* 21 CFR

814.82(c). St. Jude failed to comply with the Conditions of Approval and

Federal Regulations.

141.  Defendants, as herein before alleged, knew they did not know the suitability

of the Durata leads for long-term use and/or, in the alternative, knew that

Optim insulated leads were not suitable for long-term use in human beings.

142.  Defendants negligently failed to adequately warn doctors, the public and

Plaintiff of their lack of knowledge and/or knowledge of unsuitability such

that Plaintiff, prior to implantation in 2010 would not have had a Durata leads implanted in his body.

143.   Defendants had a continuing duty to monitor the Riata and Durata leads after pre-market approval and to discover and report to the FDA and to the doctors, public and Plaintiff, any complaints about the product's performance and any adverse health consequences of which they became aware and that are or may be attributable to the product.

144.   St. Jude negligently failed to timely provide, before Plaintiffs implantation in 2010, information to the FDA, doctors, public and Plaintiff, regarding complaints concerning the product and/or adverse health consequences, manufacturing defects and procedures, and significant improvements of which it became aware and that were attributable to the product.

145.   Had Defendants properly reported the adverse events and amended their user instructions as required under law, that information would have reached Mr. Williams and his treating physicians prior to implantation of the device, such that Mr. Williams would not have had the device implanted in him and thereafter suffered injury.

146.  As a direct and proximate result of Defendants' failure to warn of their lack of knowledge of long-term use and/or knowledge of the unsuitability of the Durata leads, timely report adverse events and failures as required under law, Mr. Williams suffered catastrophic injuries and death giving rise to claims for damages to his Estate and his heirs as more fully set forth herein.

**COUNT V**

**DAMAGES**

147.  Plaintiff incorporates Paragraphs 9 through 37 as though fully set forth herein.

148.  As a direct and proximate cause of Defendants' acts and omissions set forth herein, Mr. Williams' suffered a catastrophic injury and experienced tremendous physical and emotional pain and suffering prior to his death, damages for which his estate is entitled to recover.

149.  As a direct and proximate cause of Defendants' acts and omissions set forth herein, Plaintiff is entitled to all damages resultant from the wrongful death of Mr. Williams.

150.   As a direct and proximate cause of Defendants' acts and omissions set forth

herein, Mr. Williams' estate is entitled to payment of damages associated

with medical expenses, as well as funeral and burial costs.

## COUNT V

## PUNITIVE DAMAGES

151.   Plaintiff incorporates by reference all preceding paragraphs as though fully

set forth herein.

152.   Defendant's conduct set forth herein demonstrated reckless disregard and

an entire want of care for the right consideration of mankind, entitling the

Plaintiff to an award of punitive damages to punish and deter Defendants

from repeating and continuing such unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that the Court grant the

following relief:

a.   Trial by jury as to all claims in this action;

b.   That judgment be entered in favor of the plaintiff and against Defendants

jointly and severally, in an amount more than $75,000.00 for damages for

the full value of Desmond William's life, as well as for injuries, pain and suffering endured by Mr. Williams and for funeral and burial expenses.;

c.  For punitive damages;

d.  For prejudgment interest and the costs of suit; and

e.  For such other and further relief as this Court may deem just and proper.

This 30th day of November, 2016.

Respectfully Submitted,

*/s/William J. Atkins*
William J. Atkins
Georgia Bar No. 027060
***Attorney for Plaintiff***

**EDMOND, LINDSAY & HOFFLER, LLP**
344 Woodward Avenue, SE
Atlanta, GA 30312
T:  404.525.1080
F:  404.525.1073
batkins@edmondfirm.com